Javier LOPEZ–URENDA, Petitioner,

v.

John ASHCROFT, Attorney
General, Respondent.

No. 02–70455.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 16, 2003.

Filed Oct. 3, 2003.

As Amended Nov. 25, 2003.

Anh–Thu P. Mai, Mary Jane Candaux, United States Department of Justice Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before HUG, GIBSON * and FISHER, Circuit Judges.

## OPINION

FISHER, Circuit Judge.

Javier Lopez–Urenda entered the United States without inspection in March 1990 and succeeded in establishing a life for himself and his family here in California. In September 1996, less than three weeks before the passage of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, Pub.L. No. 104–208, 110 Stat. 3009, he filed an application for asylum. The application was not granted, and the INS initiated removal proceedings against him in 1998. The Immigration Judge denied Lopez–Urenda's motion (1) to terminate removal proceedings and (2) to institute deportation proceedings in which Lopez–Urenda may have been eligible for suspension of deportation. The Board of Immigration Appeals affirmed the Immigration Judge and Lopez–Urenda now brings this petition for review. He claims that IIRIRA's permanent rules, which became effective on April 1, 1997, are impermissibly retroactive when applied to his case. We disagree. Lopez–Urenda's case cannot be meaningfully distinguished from our recent decision in *Vasquez–Zavala v. Ashcroft*, 324 F.3d 1105 (9th Cir.2003). We hold that Lopez–Urenda's filing his asylum application before IIRIRA's passage on September 30, 1996,

Marc Van Der Hout, Stephanie Goldsborough, Van Der Hout & Brigagliano, San Francisco, CA, for the petitioner.

* The Honorable John R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

rather than during the six-month window between IIRIRA's passage and its effective date, does not take his case out of *Vasquez–Zavala's* reach. We further hold that Lopez–Urenda did not strike a bargain with the government that would support a successful quid pro quo argument. Finally, we hold that *Vasquez–Zavala* also forecloses Lopez–Urenda's due process argument. Accordingly, we deny Lopez–Urenda's petition for review.

## FACTUAL AND PROCEDURAL BACKGROUND

Lopez–Urenda is a 36–year–old native and citizen of Mexico. His two children, ages 10 and 6, are United States citizens, and he works as a manager at a baking company in San Jose, California. He entered San Ysidro, California from Mexico without inspection on about March 1, 1990. On September 6, 1996, after six and a half years in the United States and approximately three weeks before Congress passed IIRIRA, Lopez–Urenda filed his application for asylum. The application, I–589, bore the clear, bolded warning that:

> Applicants who are in the United States illegally are subject to exclusion or deportation if their asylum claims are not granted by an Asylum Officer. Any information provided in completing this application may be used as the basis for the institution of, or as evidence in, Exclusion Proceedings in accordance with 8 CFR part 236 or Deportation Proceedings in accordance with 8 CFR part 242.

In his application, Lopez–Urenda alleged that he feared returning to Mexico because of "the confrontations with the Zapatistas and the other group of guerrillas in Guerrero, the corruption, robbery on the part of PRI (political party) for the past 60 years. I believe that the Mexican state is very unstable and anything could provoke a war throughout the country."

The INS asylum office did not grant Lopez–Urenda's asylum application and instead referred it to the Immigration Court for consideration in Lopez–Urenda's removal proceedings. In September 1997, after IIRIRA's effective date, the INS issued Lopez–Urenda a Notice to Appear for these proceedings before an Immigration Judge ("IJ"). In March 1998, Lopez–Urenda made his first appearance before the IJ and was represented by counsel. Lopez–Urenda's attorney conceded removability, but informed the IJ that "[w]e'll be seeking the relief of asylum, withholding of deportation and in the alternative, voluntary departure." The IJ then continued the hearing until January 29, 1999.

On January 5, 1999, Lopez–Urenda filed his motion to terminate removal proceedings and institute deportation proceedings. In his motion, Lopez–Urenda argued that the application of IIRIRA's provisions to his case was impermissibly retroactive.[1] Lopez–Urenda's desire to be in deportation rather than removal proceedings is understandable. Under pre-IIRIRA law, Lopez–Urenda may have been eligible for suspension of deportation provided, among other things, that he had been "physically present in the United States for a continuous period of not less than seven years immediately preceding the date of [his] application" for suspension of deportation. 8 U.S.C. § 1254(a)(1) (repealed 1997). IIRIRA replaced deportation proceedings with removal proceedings and replaced suspension of deportation with cancellation of removal, a form of discretionary relief

---

**1.** Lopez–Urenda also claimed that the INS "committed affirmative misconduct" in failing to expedite the processing of his asylum application and it was therefore equitably es- topped from placing him in removal proceedings. We do not reach this argument, however, because Lopez–Urenda has not pressed it on appeal to this court.

for which Lopez–Urenda was not eligible because he did not meet the statute's new 10–year continuous presence requirement. *Id.* § 1229b(b), (d).

Lopez–Urenda then appeared before the IJ for the continuation of his removal hearing on January 29, 1999. At the hearing, Lopez–Urenda withdrew his applications for asylum and withholding of removal. The IJ denied Lopez–Urenda's motion to terminate removal proceedings but granted him voluntary departure. In the IJ's oral decision, she noted that:

> At a hearing before this Court, on March 3, 1998, counsel on respondent's behalf admitted the factual allegations contained in a Notice to Appear and conceded removability.... As the respondent has admitted the factual allegations contained in the Notice to Appear and has conceded removability, I find that removability has been established by clear and convincing evidence as required by Section 240(c) of the Act.[2]

Lopez–Urenda appealed the IJ's January 9, 1999 decision to the Board of Immigration Appeals ("BIA"). On February 14, 2002, the BIA dismissed Lopez–Urenda's appeal. It first concluded that it lacked jurisdiction to consider challenges to the INS's efficiency in adjudicating asylum applications or its decisions on when to commence deportation proceedings. It then rejected Lopez–Urenda's impermissible retroactivity argument, stating that "[w]hen he applied for asylum on September 6, 1996, the respondent had no reasonable expectation that he would be granted suspension of deportation if his application

for asylum was denied." After the BIA issued its decision, Lopez–Urenda filed this timely petition for review. New attorneys represent him on appeal.

## STANDARD OF REVIEW

██ We review de novo the legal determinations of the BIA. *See Andreiu v. Ashcroft*, 253 F.3d 477, 482 (9th Cir.2001) (en banc). Similarly, we review claims of due process violations in immigration proceedings de novo. *See Rodriguez–Lariz v. INS*, 282 F.3d 1218, 1222 (9th Cir.2002). Our review is limited to the BIA's decision because the BIA reviewed the IJ's decision de novo. *See Cano–Merida 'v. INS*, 311 F.3d 960, 964 (9th Cir.2002).

## DISCUSSION

██ ˙ "Prior to IIRIRA, immigration law provided for two types of removal proceedings: deportation (for aliens within the United States) and exclusion (for aliens outside the United States)." *Vasquez–Zavala v. Ashcroft*, 324 F.3d 1105, 1107 (9th Cir.2003). Before IIRIRA's effective date—April 1, 1997—an alien placed in deportation proceedings could apply for suspension of deportation, which "allowed an immigration judge to grant discretionary relief from deportation to any alien in deportation proceedings who could show seven years continuous presence, good moral character, and hardship to herself or a citizen family member." *Ramirez–Zavala v. Ashcroft*, 336 F.3d 872, 874 (9th Cir. 2003); 8 U.S.C. § 1254 (repealed 1997). IIRIRA replaced "deportation" with "re-

---

2. She also stated:

> The Court is extremely impressed with [Lopez–Urenda's] demeanor, his obvious respect for the Court and the proceedings, his excellent grasp of the circumstances in which he finds himself and his obvious responsibility to the society that he has attempted to try to join in his adult life....

> The Court believes that had this respondent been eligible for relief in removal proceedings, through either suspension of deportation or cancellation of removal that he would have been a good candidate for that relief and appears to be a person who would contribute to this country in a meaningful and positive way.

moval"and "suspension of deportation" with "cancellation of removal." *See* 8 U.S.C. § 1229b(b). "[A]ny alien placed in removal proceedings faces generally higher standards to qualify for cancellation of removal that include a longer physical presence requirement, a more stringent standard of hardship, and omission of consideration of hardship to the aliens themselves." *Ramirez–Zavala,* 336 F.3d 872, 2003 WL 21544177, at *1. IIRIRA contains transitional rules for cases begun by the INS before April 1, 1997 but not completed by that date; these rules generally provide that IIRIRA's changes do not apply. Cases begun by the INS after April 1, 1997, however, are governed by IIRIRA's permanent rules. *See Vasquez–Zavala,* 324 F.3d at 1107.

In *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), the Supreme Court considered the case of an immigrant criminal defendant whose guilty plea, entered before IIRIRA's effective date and rendering him deportable, was made in reliance on the possibility of suspension of deportation. 533 U.S. at 315, 121 S.Ct. 2271. After removal rather than deportation proceedings were brought against St. Cyr, he claimed that the application of IIRIRA's permanent provisions to his case was impermissibly retroactive under *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The Supreme Court agreed. *Id.* at 315, 121 S.Ct. 2271. It concluded that because St. Cyr had bargained with the government and "waive[d] several of [his] constitutional rights (including the right to trial) and grant[ed] the government numerous tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources," St. Cyr reasonably relied on the plea to maintain his eligibility for suspension of deportation and indeed had a settled expectation that suspension of deportation

would be available to him. *Id.* at 322, 121 S.Ct. 2271 (internal quotation marks omitted).

In this petition for review, Lopez–Urenda likens his case to *St. Cyr.* Just as St. Cyr gave up valuable legal rights and conferred benefits on the government, the theory goes, so too did Lopez–Urenda relinquish rights and grant the government benefits when he filed his asylum application in September 1996. Specifically, he claims that in filing the application he gave up "his right to have the INS sustain the burden of proving his alienage in a deportation (now removal) proceeding." In giving up this right and conferring a benefit on the government in the form of saved prosecutorial resources, Lopez–Urenda argues, he relied upon the continued availability of suspension of deportation in return. Lopez–Urenda claims that as a result of this quid pro quo bargain with the government, he had a settled expectation that suspension of deportation would remain available to him. To now place him in removal proceedings, where suspension of deportation is no longer available, is to "attach[ ] a new disability in respect to transactions or considerations already past," *Landgraf,* 511 U.S. at 269, 114 S.Ct. 1483, a result impermissible under *St. Cyr. See* 533 U.S. at 321, 121 S.Ct. 2271.

Before Lopez–Urenda filed his petition for review, this circuit had not yet decided whether asylum seekers like Lopez–Urenda who filed their applications prior to April 1, 1997 had "settled expectations" of being placed in deportation rather than removal proceedings such that the application of IIRIRA's permanent rules to their cases is impermissibly retroactive, just as it was for the petitioner in *St. Cyr.* We have since ruled against this argument. *See Vasquez–Zavala v. Ashcroft,* 324 F.3d 1105, 1108 (9th Cir.2003).

In *Vasquez–Zavala*, the petitioners claimed that they should be placed in deportation rather than removal proceedings because they had filed their asylum application less than a month before IIRIRA's effective date. Their theory was that because "asylum is the only alien application that *necessarily* results in an INS action in the event it is denied," this lack of prosecutorial discretion created settled expectations that they would be placed in deportation proceedings. *Id.* The Vasquez–Zavalas also presented a due process challenge to the application of IIRIRA's permanent rules to their case. *Id.*

We rejected these arguments. Although we acknowledged that "the application for asylum presents a new twist," we stated that the Vasquez–Zavalas' case was not substantively distinguishable from that of the petitioner in *Jimenez–Angeles v. Ashcroft*, 291 F.3d 594 (9th Cir.2002). *See Vasquez–Zavala*, 324 F.3d at 1107–08(noting that *Jimenez–Angeles* rejected a "settled expectations" argument brought by a petitioner who had presented herself to the INS prior to IIRIRA's effective date in the hopes of taking advantage of pre-IIRIRA law). Joining the Third Circuit, we rejected the argument that the "INS action should be construed to have commenced on [the date the petitioners] filed their asylum application," because we concluded that any expectation of being placed in deportation proceedings that the Vasquez–Zavalas might have had "could not support a sufficient expectation as to *when* it would commence." *Id.* at 1108. In addition, we concluded that "since no expectations were frustrated ... there is no colorable due process claim." *Id.* at 1109–10.

As Lopez–Urenda concedes, "this Court in *Vasquez–Zavala* found that the petitioner had not relinquished any rights, and the government had gained no benefit, as a result of his application for asylum.... Therefore, the Court found that there was no 'quid pro quo' exchange as there was in *St. Cyr* and, thus, that the application of IIRIRA to Vasquez–Zavala's case was not impermissibly retroactive." Lopez–Urenda nonetheless attempts to argue around *Vasquez–Zavala* on two grounds, neither of which is persuasive.

### 1. The Date Lopez–Urenda Filed His Asylum Application

Lopez–Urenda tries to distinguish *Vasquez–Zavala* because he filed his asylum application before IIRIRA's passage on September 30, 1996, rather than during the six-month window between IIRIRA's passage and its effective date of April 1, 1997. This distinction is meaningful, he argues, because his "settled expectation" derived from the fact that when he "filed his asylum application there was no such thing as a removal proceeding, and suspension of deportation was a viable form of relief." Although this argument might have some initial appeal, it does not take Lopez–Urenda out of *Vasquez–Zavala's* reach.

*Vasquez–Zavala* did not turn upon the fact that when petitioners filed their asylum applications on March 10, 1997, they could have known that removal proceedings were to replace deportation proceedings come April 1, 1997. In rejecting the Vasquez–Zavalas' "settled expectations" argument, we specifically stated that when they filed their application, "[p]etitioners could not properly have presumed it would be denied and that the INS would commence deportation or removal proceedings at all." *Id.* at 1108. Consistent with this statement, we conclude that Lopez–Urenda had no settled expectation that he would be placed in deportation proceedings, because—assuming he filed his appli-

cation in good faith—he had no expectation that the INS would deny the application.

*Vasquez–Zavala* went on to say that even if the petitioners assumed that their application would be denied, they did not have settled expectations as to *when* proceedings against them would commence. *Id.* The same can be said of Lopez–Urenda. Proceedings could have begun several months after he filed his application, in which case suspension of deportation would have remained a viable option; or they could have begun years later, as they did, at a time when the law had undergone significant change. That Lopez–Urenda did not know of the specific change—the enactment of IIRIRA and its permanent rules abolishing suspension of deportation—does not mean that he had a settled expectation that proceedings would commence before any such change took place. As we discuss below, he did not bargain for any particular alternative proceeding or timing.

Lopez–Urenda cannot distinguish *Vasquez–Zavala* based on his filing date. The language of *Vasquez–Zavala* is clear: it applies to cases in which petitioners filed asylum applications prior to IIRIRA's effective date, not simply to cases involving applications filed within the six-month window preceding that date.[3] *Id.*

2. *Lopez–Urenda's Quid Pro Quo Argument*

 Lopez–Urenda urges us to "reconsider the retroactivity analysis of *Vasquez–Zavala* in light of the arguments that Petitioner raises which were neither appli-

cable nor presented in that case." He argues that when he applied for asylum, he relinquished "his right to have the INS sustain the burden of proving his alienage in a deportation (now removal) proceeding." He also claims that in so doing, the government benefitted by "sav[ing] prosecutorial resources in this exchange." Lopez–Urenda's counsel is surely aware that a panel of this Circuit not sitting en banc normally cannot overturn Ninth Circuit precedent, *see United States v. Belgarde,* 300 F.3d 1177, 1181 (9th Cir.2002), but he argues that our "reconsideration" is appropriate here because "[u]nstated assumptions on non-litigated issues are not precedential holdings binding future decisions." Whatever the merits of this thesis, we do not agree that the quid pro quo issue was "not applicable" to the petitioners in *Vasquez–Zavala.*

The right that Lopez–Urenda claims to have relinquished when applying for asylum and the benefit the government thereby gained were as applicable to the Vasquez–Zavalas as they are to Lopez–Urenda. Indeed, they are equally applicable to any other asylum seeker who filed his application after the INS began to warn asylum applicants that the information they provide to the INS could be used as evidence in deportation proceedings. At the time that both Lopez–Urenda and the Vasquez–Zavalas filed their asylum applications, INS regulations stated that "information provided in the application may be used to satisfy the burden of proof of the INS in establishing the applicant's deportability under part 242 of this chapter." 8 C.F.R. § 208.3(c)(2) (re-

---

**3.** Notably, the Third Circuit case upon which *Vasquez–Zavala* relied dealt with a petitioner in Lopez–Urenda's precise position. *See Uspango v. Ashcroft,* 289 F.3d 226, 227–28 (3d Cir.2002). In *Uspango,* the petitioner filed his asylum application in July 1996, two months prior to IIRIRA's passage. That Uspango

knew nothing of IIRIRA or the replacement of deportation with removal proceedings on April 1, 1997 did not alter the Third Circuit's conclusion that the application of IIRIRA's removal proceedings to him was not impermissibly retroactive. *Id.* at 230.

pealed 1997).[4] Consistent with these regulations, the asylum applications bore the warning that "[a]ny information provided in completing this application may be used as the basis for the institution of, or as evidence in" immigration proceedings. Thus to the extent that aliens waived rights when they filed asylum applications pre-IIRIRA, a question discussed in more detail below, both Lopez–Urenda and the Vasquez–Zavalas would have done so. A conclusion that the alleged quid pro quo involved in applying for asylum under these circumstances renders the application of IIRIRA's permanent provisions to such an applicant impermissibly retroactive would necessarily overrule *Vasquez–Zavala* as to all of these petitioners.

Lopez–Urenda's second argument, that the quid pro quo issue was not directly presented or litigated, presents a closer question. The broad issue of impermissible retroactivity *was* litigated in *Vasquez–Zavala* and was decided against the petitioners. In the process, we observed that the Third Circuit had "noted the uniqueness of *St. Cyr's* plea bargain *quid pro quo* situation and rejected any similar expectations for an asylum applicant who simply filed his application before April 1, 1997," and we expressly joined the Third Circuit in "rejecting any 'settled expectations' argument where a petitioner merely filed for asylum prior to IIRIRA's effective date." *See Vasquez–Zavala*, 324 F.3d at 1108. *Vasquez–Zavala's* analysis did not further discuss the quid pro quo issue but proceeded on the assumption that no quid pro quo existed with respect to asylum applicants. Neither *Vasquez–Zavala* nor *Uspango, see supra* note 3, the Third Circuit case upon

which it relies, analyzed the right allegedly forfeited here. In order to dispel any doubt about *Vasquez–Zavala's* reach, we consider Lopez–Urenda's quid pro quo argument but reject it on its merits.

Lopez–Urenda, as discussed above, analogizes his case to that of the petitioner in *St. Cyr*, whose settled expectations of the continued availability of suspension of deportation were created by his quid pro quo bargain with the government. Unlike the petitioner in *St. Cyr*, however, Lopez–Urenda did not enter into a transaction that created settled expectations of his being placed in deportation proceedings. As Lopez–Urenda correctly points out, in September 1996 when he filed his asylum application, as now, the INS bore the burden of establishing deportability by "clear, convincing, and unequivocal evidence." 8 C.F.R. § 242.14(a) (repealed 1997); *see also Woodby v. INS*, 385 U.S. 276, 285–86, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); *Murphy v. INS*, 54 F.3d 605, 608 (9th Cir. 1995). "As a part of its burden, therefore, the INS must prove 'alienage,' *i.e.*, that the subject of the proceedings is an alien." *Sandoval–Vera v. INS*, 667 F.2d 792, 793 (9th Cir.1982); *see also Lopez–Chavez v. INS*, 259 F.3d 1176, 1181 (9th Cir.2000) ("Once the INS proves alienage, the burden shifts to the alien to prove the time, place and manner of his entry into the United States"). Thus Lopez–Urenda had the right to have his alienage proved by such evidence were he to be placed in deportation proceedings.

The key difference between his case and *St. Cyr*, as well as the other cases upon which Lopez–Urenda relies, is that when

---

**4.** The current version of the regulation states that:

> Form I–589 shall be filed under the following conditions and shall have the following consequences: (1) If the application was filed on or after January 4, 1995, informa-

tion provided in the application may be used as the basis for the initiation of removal proceedings, or to satisfy any burden of proof in exclusion, deportation or removal proceedings.

8 C.F.R. § 208.3(c).

applying for asylum Lopez–Urenda did not waive this right. INS regulations at the time that Lopez–Urenda filed his asylum application stated that "information provided in the application may be used to satisfy the burden of proof of the INS in establishing the applicant's deportability under part 242 of this chapter." 8 C.F.R. § 208.3(c)(2) (repealed 1997). In line with these regulations, Lopez–Urenda's asylum application bore the warning that "[a]ny information provided in completing this application may be used as the basis for the institution of, or as evidence in . . . Deportation Proceedings in accordance with 8 CFR part 242." These statements, however, are not inconsistent with Lopez–Urenda's right to have the government bear its burden of proving his alienage by "clear, convincing, and unequivocal ·evidence." That the evidence the government uses to sustain its burden comes from the applicant does not mean that its burden has been eradicated.

Even if we were to conclude that Lopez–Urenda did waive his evidentiary right, however, we would still reject his settled expectations argument. The right Lopez–Urenda may have relinquished and the benefit the government gained are not sufficiently substantial to support a settled expectation that, in return, suspension of deportation would be available to Lopez–Urenda were his asylum application to be denied. The concession of alienage in this case is not comparable to the numerous constitutional rights the petitioner in *St. Cyr* relinquished, including the right to trial by jury and all of its attendant safeguards. Similarly, any benefit the government may have gained in this case—such as the resources it saved in locating Lopez–Urenda and locating evidence to support its proceedings—are not so weighty as to create a settled expectation that suspension of deportation would remain available in exchange. *Cf. Jimenez–Angeles,*

291 F.3d at 602("Finally, although the government did gain something of value when Jimenez Angeles came forward—for example, in saving resources it might otherwise have expended in tracking her down—we do not believe that this is the sort of exchange contemplated by the Court in *St. Cyr.*").

### 3. *Due Process*

 Because Lopez–Urenda cannot meaningfully distinguish his case from *Vasquez–Zavala* and we conclude that he has no successful quid pro quo argument, we also follow *Vasquez–Zavala's* due process holding. We reject Lopez–Urenda's claim that his placement in removal proceedings is so fundamentally unfair as to amount to a denial of due process. *See Vasquez–Zavala,* 324 F.3d at 1108–09 ("Essentially, petitioners recast their settled expectation argument in due process jargon. . . . But since no expectations were frustrated, as discussed above, there is no colorable due process claim.").

**PETITION DENIED.**